**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

CHRISTOPHER BETANCOURTH,

                        Plaintiff,

      v.

PENNSYLVANIA      CORRECTIONS
OFFICER KNORR, et al.,

                    Defendants.

CIVIL ACTION NO. 3:22-CV-00060


(MEHALCHICK, M.J.)

**MEMORANDUM**

Before the Court is a motion for summary judgment filed by Defendant Pennsylvania Corrections Officer Knorr ("Officer Knorr").[1] (Doc. 21). Prisoner-Plaintiff Christopher Betancourth ("Betancourth"), while incarcerated at the State Correction Institution in Dallas, Pennsylvania ("SCI-Dallas"), initiated this 42 U.S.C. § 1983 civil rights action by filing a complaint on January 11, 2022. (Doc. 1). On March 17, 2023, Betancourth filed an amended complaint asserting violations of his Eighth and Fourteenth Amendment rights under 42 U.S.C. § 1983 by Officer Knorr and "John Doe Defendants at SCI-Dallas." (Doc. 17).

Officer Knorr filed the motion for summary judgment, a statement of facts, and a brief in support of the motion with accompanying exhibits on July 27, 2023. (Doc. 21; Doc. 22; Doc. 22-1; Doc. 22-2; Doc. 22-3; Doc. 22-4; Doc. 22-5; Doc. 22-6; Doc. 23). On August 24, 2023, Betancourth filed an answer to Officer Knorr's statement of facts and a brief in

---

[1] While there are still unidentified defendants in this action, Officer Knorr has indicated he does not oppose their dismissal from the action if the Court were to grant summary judgment. (Doc. 17; Doc. 21, at 1 n.1).

opposition of the motion for summary judgment, with accompanying exhibits. (Doc. 27; Doc. 27-1; Doc. 27-2; Doc. 27-3; Doc. 27-4; Doc. 27-5; Doc. 27-6; Doc. 28). On October 20, 2022, Officer Knorr filed a reply brief. (Doc. 34). The motion for summary judgment has been fully briefed and is ripe for disposition. (Doc. 21; Doc. 22; Doc. 22; Doc. 22-1; Doc. 22-2; Doc. 22-3; Doc. 22-4; Doc. 22-5; Doc. 22-6; Doc. 23; Doc. 27; Doc. 27-1; Doc. 27-2; Doc. 27-3; Doc. 27-4; Doc. 27-5; Doc. 27-6; Doc. 28; Doc. 34). For the following reasons, Officer Knorr's motion for summary judgment is **DENIED**. (Doc. 21).

I.   S<small>TATEMENT OF</small> F<small>ACTS</small>

This factual background is taken from Officer Knorr's statement of material facts and accompanying exhibits. (Doc. 22). On April 17, 2020, Plaintiff Christopher Betancourth was incarcerated in the Restricted Housing Unit ("RHU") of SCI-Dallas. (Doc. 22, ¶ 1; Doc. 22-2, at 2). On this day, Officer Knorr worked as a correctional officer in the RHU at SCI-Dallas. (Doc. 22, ¶ 2; Doc. 22-2, at 8). During the lunch meal, Betancourth attempted to grab Officer Knorr's hand, grabbed the food pass, and then grabbed a cup of unknown liquid. (Doc. 22, ¶ 3; Doc. 22-2, at 3, 6, 8). Officer Knorr ordered Betancourth to remove his hand and drop the cup; Betancourth did not comply. (Doc. 22, ¶ 4; Doc. 22-2, at 8). Officer Knorr pressed the wicket closed on Betancourth's hand; Betancourth eventually removed his hand from the wicket. (Doc. 22, ¶ 5; Doc. 22, at 6, 8; Doc. 27-1). Betancourth denies Knorr's description of the incident, and the record is inconsistent regarding the issue of whether the cup was filled with liquid. (Doc. 22-2, at 6; Doc. 22-3, at 2; Doc. 27-2, ¶¶ 12-14). The Employee Incident Report states, "Officer Knorr could not confirm the contents of the cup due to limited lighting." (Doc. 22-2, at 6). Betancourth provided a video of the incident and describing the events as follows:

Betancourth takes the apple and Knorr's hand dips down, Knorr pulls his hand away from Betancourth without any sort of struggle, Betancourth's arm is partially out of the food aperture in a nonthreatening way, Knorr closes the food aperture on Betancourth's arm, after some time passes, Knorr opens the food aperture, then Knorr escalates the situation by shutting the food aperture device forcefully on Betancourth's arm and applying significant pressure.

(Doc. 27, ¶ 3; Doc. 27-2, ¶¶ 3-11).

Betancourth also responds:

Knorr's story also has shifted. During the prison's investigation, Knorr provided: (1) Betancourth had his hand outside of the food aperture when Knorr arrived at Betancourth's cell; (2) Knorr handed Betancourth an apple; (3) Betancourth grabbed Knorr's hand and held the side of the food aperture at the same time; (4) Knorr then closed the food aperture on Betancourth's hand; (5) Knorr ordered Betancourth to place his hand back into his cell and Betancourth refused; (6) Knorr then saw Betancourth grab a cup filled with an unknown substance and Knorr put more pressure on the food aperture as a result; and (7) after Betancourth dropped the cup, Knorr released his arm from the food aperture. . . However, in the misconduct, Knorr provided: (1) Betancourth had his hand outside of the food aperture when Knorr arrived at his cell; (2) Knorr handed Betancourth an apple; (3) Betancourth threw the apple inside of his cell and grabbed Knorr's hand; (4) at the same time Betancourth grabbed Knorr's hand he picked up a cup full of an unknown substance; (5) Knorr ordered Betancourth to put the cup down and move his hand inside his cell; (6) Betancourth refused this order so Knorr shut the food aperture on his hand; (7) Knorr placed more pressure on the food aperture when Betancourth still did not drop the cup; and (8) when Betancourth dropped the cup Knorr released his arm from the food aperture.

(Doc. 22-3, at 2; Doc. 27, ¶ 3; Doc. 27-1; Doc. 27-3, at 5).

Betancourth received a misconduct from this incident. (Doc. 22, ¶ 6; Doc. 22-3, at 2-3). Betancourth was convicted of this misconduct; this conviction stands.[2] (Doc. 22, ¶ 7; Doc. 22-4, at 2). The Pennsylvania Department of Corrections ("DOC") has established a formal policy and a procedures manual for inmates, which must be followed by inmates who file

---

[2] Betancourth denies this assertion in part, stating, "It is admitted that the misconduct history attached as Exhibit C, Doc. 22-4 shows that Plaintiff was convicted of refusing to obey an order. It is denied that the misconduct history shows that Plaintiff was convicted of any of the other erroneous allegations made by Knorr in the misconduct attached as Exhibit B, Doc. 22-3." (Doc. 22-3; Doc. 22-4; Doc. 27, ¶ 7).

grievances while incarcerated at state correctional institutions operated by the Department. (Doc. 22, ¶ 8; Doc. 22-4, ¶ 2). The purpose of a grievance is to allow an inmate to bring concerns and complaints to the attention of prison officials. (Doc. 22, ¶ 8; Doc. 22-4, ¶ 2). The grievance procedures are set forth in the Department's Administrative Directive 804 (DC-ADM 804), titled Inmate Grievance System. (Doc. 22, ¶ 9; Doc. 22-4, at 8-42). Betancourth denies this assertion in part, contending that not only DC-ADM 804 is applicable in this case, but also DC-ADM 001. (Doc. 27, ¶ 9; Doc. 22-4, at 2-14).

Pursuant to the DC-ADM 804, the DOC has a three-tiered grievance system which serves as an inmate's administrative remedy: (1) an initial review by a Grievance Officer; (2) appeal to the Facility Manager or designee; and (3) appeal to the Secretary's Office of Inmate Grievance and Appeals for final review. (Doc. 22, ¶ 10; Doc. 22-4, ¶¶ 3-11). Pursuant to DC-ADM 804, a grievance must be submitted in writing, using the grievance form available on all housing units or blocks, within fifteen working days after the events noted in the grievance. (Doc. 22, ¶ 11; Doc. 22-4, ¶ 3). A grievance must include the following: a statement of facts relevant to the claim including the date and approximate time and location of the event(s) giving rise to the grievance; the identity of any individuals who were directly involved in the event(s); any claims the inmate wishes to make concerning violations of DOC directives, regulations, court orders, or other law; and any compensation or legal relief desired. (Doc. 22, ¶ 12; Doc. 22-4, ¶ 5). Once the grievance is received, the Facility Grievance Coordinator assigns it to a Grievance Officer to respond. (Doc. 22, ¶ 13; Doc. 22-4, ¶ 6). If dissatisfied with the response, an inmate may appeal the decision pertaining to their grievance to the Facility Manager. (Doc. 22, ¶ 14; Doc. 22-4, ¶ 7). The Facility Manager then provides a written response to the grievance. (Doc. 22, ¶ 15; Doc. 22-4, ¶ 8). The Facility Manager may uphold

the response, uphold the inmate, dismiss the grievance (either as untimely or on the merits), or uphold in part and deny in part. (Doc. 22, ¶ 15; Doc. 22-4, ¶ 8). The Facility Manager may also remand the Initial Review Response for further investigation or consideration. (Doc. 22, ¶ 15; Doc. 22-4, ¶ 8). If an inmate is not satisfied with the decision of the Facility Manager, then they may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. (Doc. 22, ¶ 16; Doc. 22-4, ¶ 9). Only issues raised in both the original grievance and the appeal to the Facility Manager may be appealed to this level. (Doc. 22, ¶ 16; Doc. 22-4, ¶ 9). The Secretary's Office of Inmate Grievances and Appeals then may uphold the response, uphold the inmate, dismiss, or uphold in part and deny in part. (Doc. 22, ¶ 17; Doc. 22-4, ¶ 11). An inmate has not exhausted the grievance procedure unless a grievance is properly appealed to the Secretary's Office of Inmate Grievances and Appeals. (Doc. 22, ¶ 18; Doc. 22-4, ¶ 12). Betancourth did not appeal any of his grievances related to the incident with Officer Knorr to final review. (Doc. 22, ¶ 19; Doc. 22-4, ¶¶ 13-15). SCI-Dallas staff were able to confirm that these grievances were only appealed to the facility manager, not to the final stage of review. (Doc. 22, ¶ 20; Doc. 22-5, ¶¶ 3-7). In opposition, Betancourth provides that "under binding Third Circuit precedent, administrative remedies can also be exhausted if the prison does not follow its own grievance procedure and if the grievance process is unavailable to an inmate." (Doc. 27, ¶ 18; Doc. 28, at 8); *see Robinson v. Superintendent Rockview SCI*, 831 F.3d 148, 153 (3d Cir. 2016) (holding the administrative process was unavailable to an inmate when the prison failed to meet its own deadlines to respond to the grievance submitted). Further, Betancourth admits that he did not appeal the facility manager's decision for his grievance, but denies that he failed to exhaust his administrative remedies. (Doc. 27, ¶ 19; Doc. 22-4, ¶¶ 13-15; Doc. 27-3, at 59). Betancourth contends that the DOC did not follow their own

grievance procedures and that the administrative process was unavailable to him as a "sham process that would never provide relief to Betancourth." (Doc. 27, ¶ 19). Betancourth attaches a disciplinary notice issued to Officer Knorr as a result of the incident to demonstrate that even though Officer Knorr was disciplined for failure to follow procedure, Betancourth's grievances were "summarily denied." (Doc. 27, ¶ 27; Doc. 27-5, at 2-3). Additionally attached is Betancourth's appeal to his facility manager and the appeal's denial. (Doc. 27, ¶ 19; Doc. 27-6, at 2-5). Therein, the facility manager provides no video footage of the incident exists. (Doc. 27, ¶ 19; Doc. 27-6, at 2). Because video footage does exist and was attached to the investigatory report that the grievance filed by Betancourth triggered," Betancourth claims the facility manager failed to "undertake any real review of this matter and instead acted solely to protect SCI Dallas and Knorr." (Doc. 27, ¶ 19; Doc. 27-1).

## II.   MOTION FOR SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore*, 24 F.3d at 512. "The party moving for summary judgment bears the initial burden of showing the basis for its motion . . . [and i]f the movant meets that burden, the onus then 'shifts to the non-moving party to set forth specific facts showing the existence of [a genuine issue of material fact] for trial.'" *Triad Controls, Inc.*, 593 F. Supp. 2d 741, 749 (E.D. Pa. 2009) (citing *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001)). "Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'"[3] *Velentzas v. U.S.*, No. 4: CV-07-1255, 2010 WL 3896192, at *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x 868, 869 (3d Cir. 2007) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Goode*, 241 F. App'x

---

[3] *See also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

at 869 (quoting *Berckeley Inv. Grp., Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Jakimas v. Hoffmann–La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir.2007). Further, "[t]he mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue." *Turco v. City of Englewood, N.J.*, 935 F.3d 155, 161 (3d Cir. 2019) (citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)).

## III.  DISCUSSION

Officer Knorr argues he is entitled to summary judgment because (1) Betancourth fails to exhaust his administrative remedies, (2) this case is brought in violation of *Heck v. Humphrey*, (3) Betancourth fails to establish an Eighth Amendment violation, and (4) that Officer Knorr is entitled to qualified immunity. (Doc. 23, at 3); 512 U.S. 477 (1994). In opposition, Betancourth contends he exhausted his administrative remedies when the DOC did not comply with their own procedures, and that the grievance process at SCI-Dallas is, "a sham that cleared Knorr of any wrongdoing while the DOC simultaneously disciplined Knorr for his actions giving rise to this incident." (Doc. 28, at 2). Additionally, Betancourth asserts there is a factual dispute regarding whether Officer Knorr violated Betancourth's Eighth Amendment rights and that the *Heck* doctrine does not apply to this case. (Doc. 28, at 2). Lastly, according to Betancourth, Officer Knorr is not entitled to qualified immunity. (Doc. 28, at 2).

A. Exhaustion requirements under the PLRA

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language is mandatory. *Ross v. Blake*, 578 U.S. 632 (2016). Moreover, the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91. Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[ ] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Woodford*, 548 U.S. at 93 (quoting *Porter*, 534 U.S. at 525). Courts have concluded that inmates who fail to fully or timely complete the prison grievance process are barred from subsequently litigating claims in federal courts. *See, e.g.*, *Booth v. Churner*, 206 F.3d 289 (3d Cir. 2000); *Bolla v. Strickland*, 304 F. App'x 22 (3d Cir. 2008); *Jetter v. Beard*, 183 F. App'x 178 (3d Cir. 2006).

The DOC has implemented an official Inmate Grievance System, which is governed by DC-ADM 804. (Doc. 22-5, at 8-42); Pa. Dept. of Cor. Policy DC-ADM-804. An inmate

who has been personally affected by a DOC or facility action or policy is permitted to submit a grievance or appeal pursuant to DC-ADM 804. (Doc. 22-5, ¶ 3). To properly exhaust administrative remedies, an inmate under the supervision of the DOC must follow the procedures outlined in DC-ADM 804. *Prater v. Dep't of Corr.*, 76 F.4th 184, 204 (3d Cir. 2023) ("We conclude that ADM 804 is the exclusive means of exhaustion."). In accordance with DC-ADM 804, a grievance must be submitted in writing, using the grievance form available on all housing units or blocks, within fifteen (15) working days after the events noted in the grievance. (Doc. 22-5, ¶ 3). A grievance must include the following: a statement of facts relevant to the claim including the date and approximate time and location of the event(s) giving rise to the grievance; the identity of any individuals who were directly involved in the event(s); any claims the inmate wishes to make concerning violations of DOC directives, regulations, court orders, or other laws; and any compensation or legal relief desired. (Doc. 22-5, ¶ 5). Upon receipt, the Facility Grievance Coordinator assigns each grievance (even a rejected grievance) a tracking number and enters it into the Automated Inmate Grievance Tracking System. (Doc. 22-5, ¶ 6).

If an inmate is dissatisfied with the initial response, he or she may appeal that decision to the Facility Manager. (Doc. 22-5, ¶ 7). The Facility Manager then provides a written response to the grievance. (Doc. 22-5, ¶ 8). The Facility Manager may uphold the response, uphold the inmate, dismiss the grievance (either as untimely or on the merits), or uphold in part and deny in part. (Doc. 22-5, ¶ 8). The Facility Manager may also remand the Initial Review Response for further investigation or consideration. (Doc. 22-5, ¶ 8). If an inmate is not satisfied with the decision of the Facility Manager, he or she may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. (Doc. 22-5, ¶ 9). Only issues raised in

both the original grievance and the appeal to the Facility Manager may be appealed to this level. ((Doc. 22-5, ¶ 9). The SOIGA then may uphold the response, dismiss, or uphold in part and deny in part. (Doc. 22-5, ¶ 11). An inmate has not exhausted the grievance procedure unless a grievance is properly appealed to the SOIGA. (Doc. 22-5, ¶ 12).

DC-ADM 804 includes a section specific to grievances regarding allegations of abuse. Pa. Dept. of Cor. Policy DC-ADM 804 Sec. 1.D. Such grievances "shall be handled in accordance with the Department policy DC-ADM 001, 'Inmate Abuse.'" Pa. Dept. of Cor. Policy DC-ADM-804 Sec. 1.D.2.

> A grievance dealing with allegations of abuse shall be handled in accordance with this procedures manual. This may extend the time for responding to the grievance but will not alter the inmate's ability to appeal upon his/her receipt of the Initial Review Response. When a grievance is related to an allegation of abuse, the Grievance Coordinator will issue an Extension Notice to the inmate by checking the box "Notice of Investigation." The Initial Review Response will be completed by the assigned Grievance Officer when the results from BII are received.

> Pa. Dept. of Cor. Policy DC-ADM-001 Sec. 1.B.2.4

At issue in this case is grievance # 863893, submitted by Betancourth on April 17, 2020, alleging abuse by Officer Knorr.[4] (Doc. 22-6, at 8). Betancourth also reported the alleged abuse by calling a DOC abuse helpline on April 18, 2020. (Doc. 27-3, at 2, 3, 15, 58). The Bureau of Investigations and Intelligence ("BII") undertook an investigation of Betancourth's allegations detailed in grievance # 863893 pursuant to DC-ADM 001 on April 20, 2020. [5]

---

[4] Betancourth filed this grievance pursuant DC-ADM 804. (Doc. 22-6, at 8). According to grievance # 863893, Betancourth told Officer Knorr he could not put his hand back inside his because "it was pinned in the wicket." (Doc. 22-6, at 8). When Betancourth did not move his hand, Betancourth claims Officer Knorr "began jumping on [the wicket]," and Betancourth "cried out in pain," and "felt something pop" in his wrist. (Doc. 22-6, at 8).

[5] The BII also investigated grievance #864480, which Betancourth filed on August 22, 2020 as a "re-write," alleging the same claims asserted in grievance # 863893. (Doc. 27-3, at 17). Therein, Betancourth reiterates that, after calling Betancourth a "wet back," Officer

(Doc. 27-3, at 15, 58). According to the procedures set forth in DC-ADM 804, Betancourth was to receive a response from his assigned Grievance Officer under DC-ADM 804 after the Office of Investigations and Intelligence ("OSII") reviewed the BII's report indicating the results of their investigation pursuant DC-ADM 001.[6] (Doc. 22-5, at 19; Doc. 27-4, at 7-8). DC-ADM 001 dictates that after the BII's report is submitted, "the OSII shall complete its review of the report within 15 business days of receipt." [7] (Doc. 27-4, at 7). This timing is important, as initial review of the grievance by a Grievance Officer pursuant to DC-ADM 804 only occurs after the results from the DC-ADM 001 investigation are received. (Doc. 22-5, at 19); *Prater v. Dep't of Corr.*, 76 F.4th 184, 204 (3d Cir. 2023) ("ADM 804's cross reference to ADM 001 reveals that the two policies work in tandem. . . When an inmate brings an abuse grievance, the normal ADM 804 review does not proceed until an investigation occurs in accordance with ADM 001.").

The BII submitted their investigative report to the OSII on May 6, 2020. (Doc. 27-3, at 2). The OSII did not complete its review of Betancourth's abuse allegations until October 9, 2020, over four and a half months from when it was submitted and well beyond the fifteen-day deadline. [8] (Doc. 27-3, at 59; Doc. 27-4, at 7). On October 14, 2020, Betancourth was

---

Knorr "slammed the wicket door on [Betancourth's] hand, demanding [Betancourth] put his hand inside" his cell. (Doc. 22-6, at 8; Doc. 27-3, at 17).

[6] DC-ADM 804 provides, "[t]he initial review response will be completed by the assigned Grievance Officer after the results from the Office of Special Investigations and Intelligence (OSII) are received." (Doc. 22-5, at 19).

[7] From the start of their investigation, the BII has thirty days to complete this report and send it to the OSII. (Doc. 27-3, at 6-8). In this case, the report was completed by the BII and submitted to the OSII for review on May 6, 2020, sixteen days after the investigation commenced on April 20, 2020. (Doc. 27-3, at 2). Thus, the report was timely received by OSII. (Doc. 27-3, at 6-8).

[8] The report was sent to James C. Barnacle, Director at the Bureau of Investigations and Intelligence at DOC by Security Lieutenant Corbett and dated May 6, 2020. (Doc. 27-3,

notified by his Grievance Officer that grievance # 863893 had been investigated by the BII and his allegations "were deemed unsubstantiated," and therefore under DC-ADM 804, his grievance was denied. (Doc. 22-6, at 7). This delayed Betancourth's appeal of the denial of his grievance to his facility manager to October 21, 2020. (Doc. 22-6, at 6). The appeal of grievance # 863893 to his facility manager was denied on November 9, 2020. (Doc. 22-6, at 5).

While DC-ADM 804 and DC-ADM 001 are interrelated, they are not interchangeable. *Prater*, 76 F.4th at 204. DC-ADM 001 does not provide an alternative method of exhaustion to DC-ADM 804. *Prater,* 76 F.4th at 203. However, a typical DC-ADM 804 review cannot proceed until the completion of an investigation in accordance with DC-ADM 001.[9] *Prater,* 76 F.4th at 203. "[A] prison's failure to timely respond to an inmate's properly filed grievance renders its remedies 'unavailable' under the PLRA." *Robinson v. Superintendent Rockview SCI,* 831 F.3d 148 (3d Cir. 2016); *see also Powe v. Ennis,* 177 F.3d 393, 394 (5th Cir. 1999) ("A

---

at 2). The review and decision were sent by James C. Barnacle to the Superintendent of SCI-Dallas on October 9, 2020. (Doc. 27-3, at 59). Given the fifteen-day deadline, the review should have been sent to the Superintendent on May 28, 2020. (Doc. 27-3, at 2; Doc. 27-4, at 7).

[9] In *Prater*, the Third Circuit describes the interaction between DC-ADM 804 and DC-ADM 001 as follows:

> ADM 804's cross reference to ADM 001 reveals that the two policies work in tandem, not in place of one another. When an inmate brings an abuse grievance, *the normal ADM 804 review does not proceed until an investigation occurs in accordance with ADM 001. The Grievance Officer does not provide an initial response to an abuse-related grievance until he receives and reviews the documentation from the ADM 001 investigation.* But that does not change the fact that ADM 804 is the sole procedure for obtaining an adjudicatory decision subject to appeal. A different conclusion would nullify the grievance review process outlined by ADM 804. While ADM 001 produces investigative reports that may help the ADM 804 process along, among other purposes, it does not replace ADM 804.

> 76 F.4th at 204 (emphasis added).

13

prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed and the state's time for responding thereto has expired."). The Third Circuit is clear, "the PLRA requires that prisoners comply with the procedural demands of a system created by their jailors. No less must prisons comply with the demands of the system they created." *Shifflett v. Korszniak*, 934 F.3d 356 (3d Cir. 2019). Because a "DC-ADM 804 review cannot proceed until the completion of an investigation in accordance with DC-ADM 001," administrative remedies became unavailable to Betancourth when the OSII "failed to timely (by its own procedural rules) respond to his grievance" by delaying their review for four and a half months, way beyond the fifteen day deadline. [10]*Prater*, 76 F.4th at 203; *Robinson*, 831 F.3d at 154; *see Shifflett*, 934 F.3d at 359 ("[Plaintiff] exhausted administrative remedies and acquired the right to come into federal court when the prison did not decide the initial appeal of his grievances within the time limits specified by the grievance policy.") Accordingly, the Court will deny summary judgment on this ground. [11]

B. Application of the *Heck* Doctrine

In *Heck v. Humphrey*, the Supreme Court held that:

---

[10] Additionally, Betancourth's "decision to accept [the belated OSII response] in good faith and pursue his claim through the remainder of the belated administrative process does not rectify the prisons errors." *Robinson*, 831 F.3d at 154.

[11] The Court acknowledges Betancourth's argument that the administrative remedy procedures at SCI-Dallas are a "sham." (Doc. 28, at 12-14). However, as the Court has found summary judgment is not appropriate on the exhaustion issue, the Court will not address this argument on the merits. (Doc. 28, at 12-14). Additionally, the Court notes that while Betancourth argues that Officer Knorr was disciplined for his handling of the April 17, 2020 incident, demonstrating that "that even when an investigation into a corrections officer finds that he violated DOC policies, an inmate's grievance will still be denied," the disciplinary record provides Officer Knorr was not found in violation of DOC policies or for closing the wicket of Betancourth's arm, but for "not securing the wicket immediately after placing the Styrofoam container in the food aperture." (Doc. 27-5, at 2; Doc. 28, at 13).

> In order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a Section 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such [a] determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck*, 512 U.S. at 486-87 (footnote omitted).

This "favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough v. Smith*, 139 S. Ct. 2149, 2152 (2019). "The requirement likewise avoids allowing collateral attacks on criminal judgments through civil litigation." *McDonough*, 139 S. Ct. at 2152. However, in the context of an excessive force claim, the *Heck* doctrine does not create a *per se* bar on claims of excessive force even where plaintiff has been convicted of the underlying arrest, crime, or misconduct arising from the incident where force was used. *Garrison v. Porch*, 376 F. App'x 274, 277-78 (3d Cir. 2010) (excessive force claim not barred by *Heck* despite simple assault conviction); *Lora-Pena v. FBI*, 529 F.3d 503, 506 (3d Cir. 2008) (resisting arrest and assault conviction did not bar excessive force claim); *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997) (resisting arrest conviction did not bar excessive force claim).

Officer Knorr argues that *Heck* is applicable in this case because accepting Betancourth's version of events would invalidate his conviction. (Doc. 23, at 8). Betancourth argues that the Heck doctrine does not bar claims of excessive force *per se*, and that, because

a jury could find Officer Knorr used excessive force was used despite the conviction, the *Heck* doctrine does not apply. (Doc. 28, at 23).

The Court agrees with Betancourth. Summary judgment would be inappropriate because a reasonable juror could find Betancourth's conviction stands even if he successfully argues Officer Knorr used excessive force. (Doc. 22-4, at 2; Doc. 23, at 7-11; Doc. 27-2, ¶ 6, Doc. 28, at 22-24); s*ee Flood v. Schaefer*, 367 F. App'x 315, 319 (3d Cir. 2010) (finding when it is "analytically possible" that an alleged constitutional violation would not negate a conviction, plaintiff is not barred by the *Heck* doctrine); *see also Garrison*, 376 F. App'x at 279 (explaining an excessive force claim was not barred by *Heck* because "[a] reasonable jury could find that, even considering [Plaintiff's] initial behavior which constituted a simple assault, [Defendant] used an unreasonable amount of force in arresting him, and in doing so violated his constitutional rights."). Betancourth was convicted of Refusing to Obey An Order. (Doc. 22-4, at 2). Based on the misconduct report, Officer Knorr ordered Betancourth to drop a cup he was holding[12] and to return his hand inside his cell.[13] (Doc. 22-3, at 2). A reasonable juror could find both that Betancourth was properly convicted of refusing Officer Knorr's order to drop the cup and/or remove his hand, and that Officer Knorr used excessive force by pressing Betancourth's hand in the food aperture with increasing strength to the point where Betancourt declares he was "screaming in pain." (Doc. 22-4 at 2; Doc. 27-1; Doc. 27-2, ¶ 8). Accordingly, the Court will deny summary judgment on the basis of *Heck*. (Doc. 21); *see*

---

[12] There is an issue of material fact regarding whether Betancourth as holding a cup at the time of the incident. (Doc. 22-2, at 6; Doc. 22-3, at 2; Doc. 27-2, ¶¶ 12-14).

[13] Betancourth admits that he did not obey Officer Knorr's order to "put my arm back in my cell because it was trapped in the plastic." (Doc. 22-4, at 2; Doc. 22-6, at 8; Doc. 27-2, ¶ 6).

*Bingham v. Knorr*, No. 3:21-CV-1697, 2023 WL 5153548, at *5 (M.D. Pa. Aug. 10, 2023) (determining that because a reasonable juror could find excessive force was used by correctional officers despite an inmate's conviction for the underlying misconduct, *Heck* doctrine was inapplicable and summary judgment was inappropriate).

### C.  EIGHTH AMENDMENT VIOLATIONS

When prison officials are accused of using excessive force in violation of the Eighth Amendment, the inquiry "is whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Not "every malevolent touch by a prison guard" violates the Eighth Amendment. *Hudson*, 503 U.S. at 9. The Third Circuit has provided;

> In determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, courts look to several factors including: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

*Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 321(1986)).

"The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9 (quoting *Whitley*, 475 U.S. at 327 (1986)). Thus, "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). However, to establish an Eighth Amendment excessive force claim, an inmate does not need to show that he suffered a significant, or even a more than *de minimis*, injury. *Wilkins*, 559 U.S. at 37. Rather, the central issue is whether

the force used by the officer was appropriate given the circumstances, not the injury caused by the officer. *Flood v. Schaefer*, 439 F. Appx. 179, 182 (3d Cir. 2011); *see also Sosa v. Grillo*, No. 12-1724, 2014 WL 359673, at *12 (M.D. Pa. Feb. 3, 2014).

Officer Knorr argues he used force because Betancourth ignored his orders to stop "interfering with the wicket and reaching for a cup of unknown liquid." (Doc. 23, at 11). Officer Knorr states that as a reaction to Betancourth's refusal to obey orders, he "closed the wicket on [Betancourth's] hand until compliance was gained." (Doc. 23, at 11). Betancourth submits there are still issues of material fact surrounding whether excessive force was used given the particular facts of this case. (Doc. 28, at 14-18).

Summary judgment is inappropriate at this juncture because there are issues of material fact surrounding the necessity of the force used by Officer Knorr. *See Giles v. Kearney*, 571 F.3d 318, 326-27 (3d Cir. 2009) (reversing a grant of summary judgment where there were issues of material fact surrounding the necessity of the force). There are three versions of events under review of this Court: Betancourth's version, as documented in his grievances, BII interview, and declaration; Officer Knorr's version, as documented in his misconduct reports and BII interview; and the surveillance footage version of the event that does not include sound.[14] (Doc. 22-2, at 6; Doc. 22-3, at 2; Doc. 27-1; Doc. 27-2, ¶¶ 5-9); *Ricks*, 891 F.3d at 480.

_____

[14] Courts are permitted to review video evidence when deciding whether any genuine disputes of material fact exist for the purposes of a motion for summary judgment, including for cases involving use of excessive force. *See Bomar v. Braunlich*, No. CV 17-1035, 2022 WL 17828858, at *1 (W.D. Pa. Dec. 21, 2022); *see, e.g., McDowell v. Sheerer*, 374 F. App'x 288, 291-92 (3d Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that a Court must view facts in the light depicted by video evidence where there are no allegations that the footage has been doctored or altered in any way). Accordingly, in considering whether the record supports unequivocally that Defendants did or did not use excessive force, the Court

All parties agree and the video footage confirms that the incident took place as Officer Knorr was handing Betancourth an apple. (Doc. 22-3, at 2; Doc. 22-6, at 8; Doc. 27-1; Doc. 27-2, ¶ 15). Betancourth claims Officer Knorr "slammed the wicket door on [his] hand" while demanding Betancourth put his hand back inside his cell. (Doc. 22-6, at 8). Betancourth alleges he told Officer Knorr he was unable to comply because his hand was pinned in the wicket. (Doc. 22-6, at 8). As way of a response, Officer Knorr "began jumping on" the wicket, causing Betancourth to cry out in pain. (Doc. 22-6, at 8). Betancourth states he required medical care as a result of the incident. (Doc. 22-6, at 8; Doc. 27-2, ¶¶ 18-19). Video footage of the event corroborates Betancourth's assertion that Officer Knorr escalated in the amount of force he used on the wicket, however Officer Knorr does not appear to be jumping.[15] (Doc. 22-6, at 8). The video depicts Officer Knorr closing the wicket on Betancourth's hand and wrist and applying pressure. (Doc. 27-1, at 0:25-0:45). After several seconds, Officer Knorr uses both hands to press down with full force on Betancourth's wrist. (Doc. 27-1, at 0:35). Because there is no sound, it is unclear whether Betancourth cried out or what orders Officer Knorr was giving at the time of the incident. (Doc. 27-1). From start to finish, Betancourth's arm is closed ion the wicket for about twenty seconds. (Doc. 27-1, at 0:25-0:45).

According to Officer Knorr, Betancourth grabbed Officer Knorr's hand while he was passing out lunch. (Doc. 22-3, at 2). In the video, it does appear Betancourth is grabbing for something, though he does not make significant contact with Officer Knorr's arm. (Doc. 27-

---

considers the video footage of the incident attached by Betancourth as an exhibit to his answer to Defendants' statement of material facts. (Doc. 27-1).

[15] An inmate-witness testified to the BII that he heard Betancourth tell Officer Knorr, "Your gonna break my arm," and that Officer Knorr subsequently threatened the inmate-witness saying, "Ya f[***] with me what happened to Betancourth will happen to you." (Doc. 27-3, at 5, 6).

1, at 0:23). Officer Knorr alleges Betancourth grabbed a cup "full of an unknown substance" inside his cell. (Doc. 22-3, at 2). This is not visible from the video, which provides no view of what happened in Betancourth's cell. (Doc. 27-1). After Betancourth refused orders to put the cup down and remove his hand from the wicket, Officer Knorr admits he closed the wicket door on Betancourth's hand. (Doc. 22-6, at 2). Once Betancourth dropped the cup, Officer Knorr claims he opened the wicket door. (Doc. 22-6, at 2). He does not mention the escalating force he used on the wicket door.[16] (Doc. 22-6).

Taking the facts in the light most favorable to Betancourth, a reasonable jury could conclude that Officer Knorr used excessive force in violation of the Eighth Amendment. *See Bingham v. Knorr*, No. 3:21-CV-1697, 2023 WL 5153548, at *6 (M.D. Pa. Aug. 10, 2023) (denying summary judgment where a reasonable jury could find an inmate's story alleging excessive force in violation of the Eight Amendment credible). Accordingly, summary judgment on Betancourth's Eighth Amendment claim is denied. *See Zimmerman v. Schaeffer*, 654 F. Supp. 2d 226, 252 (M.D. Pa. 2009) (Finding, "[i]n sum, genuine issues of material fact preclude Defendants' motions for summary judgment in all respects apart from [Plaintiff's] Eighth Amendment claim for excessive force"); *see also Bingham*, 2023 WL 5153548, at *6 ("At this point, taking the facts in the light most favorable to the non-movant, a reasonable jury could find [Plaintiff's] version of events credible and conclude that Defendants used excessive force in violation of the Eighth Amendment").

### D. QUALIFIED IMMUNITY

---

[16] A staff witness testified to the BII that he heard Officer Knorr give Betancourth verbal orders to "drop the cup" that Betancourth did not comply with. (Doc. 27-3, at 6). In response, Officer Knorr applied "additional pressure." (Doc. 27-3, at 6). Another staff witness testified that Betancourth "grabbed at officer Knorr's hand and then placed his hand outside of the wicket in an effort to take it hostage." (Doc. 27-3, at 8).

Qualified immunity provides not merely a "defense to liability," but rather "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). Specifically, "[q]ualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). An official who reasonably believes his conduct to be lawful is thus protected, as qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010). At the time of the violation, there must be a clear legal principle that "prohibit[s] the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citation omitted). The Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Here, because the parties challenge whether Officer Knorr violated a clearly established right, the Court will consider the second prong of the qualified immunity analysis first. (Doc. 23, at 11-13; Doc. 28, at 19). "A right is 'clearly established' if a reasonable actor under the circumstances would have known that his or her conduct impinged upon constitutional mandates." *Broadwater v. Fow*, 945 F. Supp. 2d 574, 585 (M.D. Pa. 2013). A right may be clearly established without "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. "In determining whether a right has been clearly established, the court must define the right

allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012); *see also al–Kidd*, 131 563 U.S. at 742 ("We have repeatedly told courts ... not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.") (citations omitted). Because the line between acceptable force and excessive force can be difficult to discern, an officer is entitled to qualified immunity absent existing precedent which "'squarely governs' the specific facts at issue" and adequately notifies the officer that a specific use of force is unlawful. *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 15 (2015)). The caselaw does not have to be "directly on point," but existing precedent must have placed the question of unlawfulness "beyond debate." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 196 (3d Cir. 2021) (quoting *al-Kidd*, 563 U.S. at 741.).

Here, Officer Knorr challenges whether the conduct Betancourth complains of violated a clearly established right. (Doc. 23, at 13). Pointing to *Taylor v. Reinard*, where this Court granted summary judgment in favor of an officer "who forcibly removed a plaintiff's hand from a wicket," Officer Knorr asserts he is entitled to summary judgment. No. 3:CV-12-0891, 2013 WL 4647421 (M.D. Pa. Aug. 28, 2013). Betancourth distinguishes *Taylor* from the facts at bar, stating that the correctional officer "in *Taylor*, instead of forcefully pushing on the aperture as Knorr did, backed away from the cell door when he realized the inmate could not harm him." (Doc. 28, at 20); 2013 WL 4647421, at *2 (providing that after the correctional officer attempted to close the wicket and Inmate-Plaintiff ignored orders to remove his hands, the correctional officer retreated because he "could see both of [Inmate-Plaintiff's] hands, and quickly observed that [Inmate-Plaintiff] did not appear to have a

weapon," thus was not a threat). This Court agrees with Betancourth's characterization of *Taylor* and finds that, in this case, factual disputes exist that may result in a jury finding that Officer Knorr violated Betancourth's Eighth Amendment right to be free from cruel and unusual punishment. *See supra*. Thus, because there are still questions of material fact surrounding whether Officer Knorr violated a clearly established right, Officer Knorr is not entitled to qualified immunity at this time. *See Giles*, 571 F.3d at 327-28 (finding correctional officers were not entitled to qualified immunity where "a dispute of material fact" existed regarding the alleged excessive force because "the critical event was controverted"); *see also Younger v. Gross*, No. 20-878, 2023 WL 2433363, at *8 (W.D. Pa. Mar. 9, 2023) (denying summary judgment because there were questions of material fact surrounding the alleged use of force that prevented a finding of qualified immunity).

## IV.   CONCLUSION

For the reasons stated herein, the Officer Knorr's motion for summary judgment is **DENIED**.

An appropriate Order follows.

BY THE COURT:

Dated: March 29, 2024

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States District Judge**